**FRANK P. DOW CO., Inc., et al.**

v.

**UNITED STATES.**

Reappraisement R64/24209 and 45 others.

United States Customs Court.

Oct. 11, 1967.

Sharretts, Paley, Carter & Blauvelt, New York City (Eugene F. Blauvelt and Donald W. Paley, New York City, of counsel), for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Bernard J. Babb, trial attorney), New York City, for defendant.

WILSON, Judge:

These 46 appeals for reappraisement were consolidated for trial. Twenty-eight of them were entered at Portland, Oregon, 17 at Seattle, Washington, and 1 at Tacoma, Washington.

The imported merchandise is invoiced as structural steel shapes, steel bolts and steel plates or castings. The invoices herein list only "bolts," but plaintiffs' exhibit 1–B indicates "bolts and nuts" were imported. The manufacturer and exporter is Societa Anonima Elettrificazione, S.p.A., hereinafter referred to as S.A.E., of Milan, Italy. This merchandise was exported during 1960 and 1961. It was manufactured in accordance with certain specifications provided and approved by the United States Department of the Interior, Bonneville Power Administration, hereinafter referred to as B.P.A., of Portland, Oregon. These specifications were in conformity with the "Terms and conditions of the invitation for bids," No. 8960, and of the award to S.A.E. under contract No. 14–03–001–14466, hereinafter referred to as 14466 (exhibit 1–A).

Counsel for the respective parties agree that constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165, is the proper basis for determining the value of the imported merchandise.

The invoiced prices and the importers' claimed constructed value in *all* appeals for reappraisement are, per pound:

| Merchandise | Invoiced prices | Claimed values |
| --- | --- | --- |
| Structural shapes | $0.08123 | $0.08479 |
| Steel bolts | $0.20 | $0.19879 |
| Plates or castings | $0.13 | $0.12863 |

The appraised values on the basis of constructed value are as follows:

The Portland entries were appraised at unit invoice prices, per pound, plus 26.6 percent for structural shapes, plus 11.1 percent for steel bolts, and plus 19.6 percent for plates or castings.

The Seattle entries were appraised at $0.10284 for structural shapes, $0.2222 for steel bolts, and $0.1555 for plates or castings, all per pound.

The Tacoma entry was appraised at $0.1028 for structural shapes, and at $0.2221 for steel bolts, all per pound.

Although the appraiser at Portland added a percentage to each unit invoice price, the final unit price of each item of merchandise resulting therefrom is equal to the unit appraised value for each identical item appraised at Seattle and Tacoma.

Plaintiffs' claim is that the sole issue in this case is "whether or not plaintiff has established, by competent evidence, all of the elements of Constructed Value."

Furthermore, it asserts that an affidavit, plaintiffs' exhibit 1, together with the testimony of plaintiffs' witnesses, establishes all elements of constructed value. The plaintiffs also contend that the appraisements herein do not have any presumption of correctness because they do not separately specify the elements of constructed value as required by the statute, section 402(d), as amended, supra, "but merely state total unit value."

The defendant contends that plaintiffs have failed to establish their claimed values as the correct statutory constructed value. Counsel for defendant also argues that the cost of drawings and the cost of tower tests, not included in plaintiffs' claimed values, are part of constructed value. It is further argued by defendant that plaintiffs have not adequately shown general expenses and profit.

Section 402(d) of the Tariff Act of 1930, as amended, supra, is as follows:

(d) Constructed Value.—For the purposes of this section, the construct-

ed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

Plaintiffs' collective exhibit 1 consists of the following documents: A joint affidavit made by the administrative manager, the chief engineer and the commercial manager respectively of S.A.E.; the invitation to bid, No. 8960, which became contract No. 14466 (exhibit 1–A); a schedule listing the shipments involved herein and other shipments under said contract (exhibit 1–B); a template partly drilled, of one of the pieces involved in said contract (exhibit 1–C); and a copy of the shop detail drawing which supplied the dimensions (exhibit 1–D).

Defendant offered two reports of a customs representative dated at Rome, Italy, August 14, 1962, and March 6, 1963, respectively, received as exhibits A and B. Defendant's brief merely refers to exhibit A without showing its applicability to the values returned by the appraisers. Upon consideration of exhibit A, the court is of opinion that it does not support the findings of value returned by the appraisers. Defendant's brief, page 18, refers to exhibit B and points out that a representative of S.A.E. stated that the costs for testing four towers were set at $5,130, whereas the affidavit in collective exhibit 1 states that S.A.E. was paid $4,980 therefor. According to said affidavit, the latter figure equates to 0.23 lira per kilo based upon the total fabrication of 29,561,335 pounds of steel under 14466, concerning which said affidavit also states "but since these tests played no part in the fabrication of the steel supplied under Contract 14466, the cost thereof has not been included in the cost set forth infra."

The joint affidavit in collective exhibit 1 alleges that the three affiants—

* * * are responsible and in overall charge of the sale and fabrication of structural steel for use in electric transmission towers, including the sale and fabrication of such material for exportation to the United States and the keeping of financial records in connection therewith.

It is further alleged that, in addition to the general invitation to bid for the manufacture of the steel structural parts here involved, there was included an invitation to bid upon the performance of certain specified tests upon four tower types of the 22 types involved, and that the successful bidder, S.A.E. was paid $4,980 (said to be $5,130 in exhibit B, supra) for performing these tests; that the tests were no part of the fabrication of the steel and that the tests were performed at S.A.E.'s testing station, a separate facility one kilometer distant from the plant where all the steel under contract No. 14466 was fabricated; that S.A.E. was the only company in Italy fabricating this type of steel for exportation to the United States until 1965; that the steel supplied to B.P.A. was fabri-

cated according to specifications in contract No. 14466. The fabrication methods are described. It is also stated that in order to make the steel template which is first made in order to fabricate the structural shape—

* * * shop detail drawings of each piece are sent to the fabricating shop where a worker coats a piece of steel with white paint (this for the purpose of making pencil marks legible) and marks on the piece the exact location of each cut and the size and location of each bolt hole to be drilled and/or punched as indicated on the shop detail drawing.

The piece is then punched and cut according to the pencilled markings. The shop detail drawings are to scale whereas the template is the actual size required by the Specifications.

The affiants also allege that 1,859 shop detail drawings were used in making the templates required for fabrication of which 688 were made by S.A.E. draftsmen in accordance with the specifications, while 1,171 were furnished by B.P.A. at no cost to S.A.E.; that 1,167 of the 1,171 drawings were used to make templates for structural shapes; 3 for making templates for plates of stamped steel and steel casting, while 1 shop detail drawing was required for the fabrication of bolts and nuts. As the B.P.A. drawings were in feet and inches, the S.A.E. draftsmen converted each dimension to metric measurement, which equivalent was written over or under each feet and inch dimension. This conversion cost 5,-760 lira and is said to be included in the cost of materials and fabrication shown infra. The cost of the 688 drawings made by S.A.E. was 19,500 lira per drawing and is said to be included in the amount shown, infra, for cost of materials and fabrication.

The affiants further stated that 185 design drawings accompanied B.P.A. bid invitation No. 8960 and, after the contract was signed, B.P.A. furnished 8 more design drawings which together with 235 erection drawings also furnished by B.P.A. allegedly "served [no] any purpose in the fabrication of the steel"; that the erection drawings are, allegedly "for the use of the Contractor who builds the towers on their permanent sites."

The affiants state that they "have examined the cost records of the Company and state that the costs of materials and fabrication of the materials supplied for Contract 14466 are as stated below" (see schedule, infra); that the fabrication commenced in November 1959 and continued to April 1961, during which period the cost of material and fabrication remained constant, and included all direct labor in fabrication as well as the net cost of material less Italian sales tax which was refunded upon exportation and less the amount recovered from material which was sold as scrap; that all other labor charges, including the making of the templates, incurred in fabricating the steel are also included in the cost of materials and fabrication.

Affiants list the names and address, date of awards and tonnage of fabricated steel of the same general class or kind sold to other United States companies during 1959, 1960, and 1961. They then allege that they have—

* * * examined SAE records, kept in the ordinary course of business, of the aforesaid sales for export to the United States and state the amount for general expenses and profit reflected in the sales prices of steel on B.P.A. Contract 14466 was equal to that reflected in the sales to the other United States Companies listed supra. The amounts of general expenses and profit in the case of B.P.A. Contract 14466 were: [See schedule infra.]

Affiants also allege that the greater part of the fabricated steel consisted of structural shapes which were packed ready for exportation to the United States in uncovered bundles held together by wire, and that the only cost aside from the small cost of the wire was labor; that

the bolts and nuts were packed in wooden cases which added to the cost of packing and that plates and stamped steel and steel castings were packed in bundles and crates, respectively. These costs of packing are also shown in the following schedule of alleged costs, and general expenses and profit as shown in the affidavit, collective exhibit 1. All prices are in Italian lira, per kilo.

| Merchandise | Cost of material & fabrication | General expenses and profit | Cost of packing | Total cost |
|---|---|---|---|---|
| Structural shapes | 99.60 | 13.40 | 3.00 | 116.00 |
| Bolts and nuts | 225.00 | 30.00 | 17.00 | 272.00 |
| Plates of stamped steel and steel castings | 152.00 | 20.00 | 4.00 | 176.00 |

The affiants convert the above total cost figures in Italian lira to United States cents per pound at the rate of .00161080 U. S. cents per lira and 2.204 pounds per kilo, and arrive at the following total cost per pound:

Structural shapes      $00.08478*

Bolts and nuts      $00.19879

Plates of stamped steel and steel castings      $00.12863

The foregoing are the figures contended for by plaintiffs on the basis of constructed value.

The plaintiffs called three witnesses, Forest Willard Farr, head of the Transmission Design Section of Bonneville Power Administration of Portland, Oregon; Logan C. Stewart, retired, head of the Procurement Section of Bonneville Power Administration from 1938 to 1965; and Paul I. Fahey of Chattanooga, Tennessee, retired, former Director of Purchasing for Tennessee Valley Authority.

Mr. Farr, a civil engineer of many years' experience, testified concerning the business of B.P.A. as a distributor of electrical current. He told how their extensive distribution lines were designed and constructed. The witness testified at length concerning drawings, designs, specifications, etc., used by and on file with B.P.A. He also described in considerable detail the plans, drawings and specifications used in the manufacture of the involved merchandise.

Mr. Stewart, plaintiffs' second witness, stated that he was familiar with contract 14466 involved in this litigation. He further testified that the bids under said contract were obtained "in the ordinary course of business for Bonneville," and were in the same form and handled in the same manner as other contracts. The witness said that certain drawings and specifications furnished by the Transmission Design Section of B.P.A. were sent out as part of the invitation to bid under contract 14466. Mr. Stewart said the invitations to bid were sent to steel fabricators in the United States as well as to S.A.E.

The third and last witness for the plaintiffs, Paul I. Fahey of Chattanooga, Tennessee, an employee of the Tennessee Valley Authority from 1935 to 1965, and Director of Purchasing for T.V.A. for 13 years, testified that his division bought "everything for TVA in the way of materials and supplies." This included "steel fabricated for the purpose of making electric transmission towers." (R. 37.) Mr. Fahey stated that he purchased great quantities of such materials for T.V.A. When asked how, if at all, T.V.A.'s "practice in issuing invitations for bids on fabricated steel" differed

---

* Plaintiffs' brief pages 39 and 40 states it as $00.08479.

from the procedure outlined by the witnesses, Farr and Stewart, Mr. Fahey said, at page 39:

> I say except in the matter of detail the practice of the Tennessee Valley Authority and the Bonneville Power Administration, as described here this morning, generally parallels each other insofar as the procurement of steel for construction of transmission towers is concerned.

In considering and assessing the weight to be given to the evidence herein, the court is of the opinion that the testimony of Stewart and Fahey, as well as the evidence in defendant's exhibits A and B, does not assist in establishing that plaintiffs' claimed constructed values are correct, or that the appraiser's returned constructed values are incorrect or erroneous.

Based upon the testimony of Farr, it seems clear that the design drawings, shop detail drawings and erection drawings, whether originally prepared by B.P.A., S.A.E., or other fabricators involved under previous contracts with ·B.P.A., were for use in connection with contract 14466 and the separate test contract in reference thereto; that the purpose of the shop detail drawings was to show the fabricator how the towers were to be constructed, and how the various pieces in the towers were to be made. He said that this was needed in order to fit the specifications. Likewise, the design drawings would be needed by the fabricator to show what he was supposed to build (R. 23–27).

This testimony does not aid the court in determining the constructed value of the merchandise at bar. There is nothing in the record to indicate whether the cost, if any, of the various plans, drawings, specifications, etc., was included in the appraised value. If it was, there is no proof of the value of said materials.

The affiants in exhibit 1 allege that they have examined the company's (S.A.E.'s) cost records and "state that the costs of materials and fabrication of the material supplied for Contract 14466 are as stated below." They have been heretofore shown in the schedule, supra, as were the general expenses and profit, as well as the cost of packing, and need not be here repeated. The affiants also allege that they have examined the records of S.A.E., kept in the ordinary course of business in reference to sales to other United States firms in 1959, 1960 and 1961, and state that the amount for general expenses and profit reflected in the sales prices of steel on contract 14466 "was equal to that reflected in the sales to the other United States Companies listed supra." This is a *conclusion* of the affiants which the court should be able to arrive at from factual evidence. It is an ultimate fact, *not* a reasoned conclusion drawn from evidentiary facts. "The ultimate facts are the *issuable* facts without proof of which plaintiff cannot recover." [Italics quoted.] Brooks Paper Company v. United States, 40 CCPA 38, 45, C.A.D. 495, citing cases.

■ Section 402(d) (2) on constructed value provides for "an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States." The determination of whether or not general expenses and profit are "equal to that usually reflected in sales of merchandise," etc., cannot be left to speculation, but must be based upon satisfactory evidentiary probative facts from which the court may so determine. It may *not* be determined by a witness orally or by affidavit, *without the elements of proof,* that such actually was the case. "The courts may not properly supply from imagination the essentials in which proofs are deficient." United States v. Malhame & Co., 19 CCPA 164, 171 T.D. 45276.

■ While affiants allege that they examined the cost records pertaining to the costs of material and fabrication as

well as to general expenses and profit, they further allege that "The actual cost of packing for each type of steel was * * *" (schedule supra). These affiants do not indicate the source from which those packing costs were obtained, nor which one of the three affiants is personally, actually knowledgeable thereof or of the costs of material, etc., or with the general expenses and profit, or who kept the company books or who originally made the entries in the cost records. It is clear that there is no allegation that either of them actually originally made up the cost figures or was personally familiar with them or supervised their preparation, though they cumulatively allege responsibility for "the keeping of financial records in connection" with "the sale and fabrication of structural steel for use in electric transmission towers." There is nothing of record to indicate that either affiant is personally familiar with cost accounting as an accountant. Merely having charge of books or cost records does not entitle statements respecting their contents to carry weight. Note Descoware Corp. (Westland) v. United States, 58 Cust.Ct., Reap. Dec. 11297 (involving cost of production), citing United States v. Wirth et al., Wirth et al. v. United States, 24 CCPA 188, 193, T.D. 48654, citing United States v. Brown & Co., 4 Ct.Cust.Appls. 102, T.D. 33374. See also Chaffee & Co. v. United States, 18 Wall. 516, 85 U.S. 516, 21 L.Ed. 908, referred to in the *Brown* case, supra.

In Fashion Ribbon Co., Inc. v. United States, 58 Cust.Ct., Reap. Dec. 11314, the court held that knowledge derived by an affiant "as owner and operator of the manufacturer and as one who personally maintained or supervised the keeping of the books of account and records of the company" and similar affidavits by persons having knowledge of facts personally and from the books and records of the manufacturer are competent to establish a *prima facie* case, citing cases. The affiants in the case at bar *do not meet* the foregoing standards

of personal maintenance, supervision or of keeping the books or records, or of personal knowledge of the facts of costs or of the general expenses and profit either of the instant merchandise or of the merchandise involved in the sales to other United States purchasers. Hence, their statements as to such costs and general expenses and profit, unaccompanied by satisfactory proof may not be accepted as S.A.E.'s general expenses and profit in the instant importations which are "equal to that reflected in the sales to the other United States Companies."

In C. J. Tower & Sons of Buffalo, Inc. v. United States, 58 Cust.Ct., A.R.D. 223, affirming Same v. Same, 55 Cust.Ct. 586, Reap. Dec. 11058, the First Division, Appellate Term, held that appellant failed to present any satisfactory evidence of the general expenses and profit involved in constructed value for the merchandise. In the case at bar, the evidence relating to general expenses and profit in constructed value is *not* such satisfactory evidence as would be acceptable for statutory purposes. This applies equally here as in the *Tower* case, supra, though related parties were there being considered, which is not the case in the instant controversy.

Respective counsel have filed briefs and reply briefs, all of which have been carefully perused and considered, together with all of the oral and the documentary evidence. While some of the arguments pro and con, and some of the cases cited by counsel are not referred to herein, the court has considered them, but deems them unnecessary in order to arrive at a decision herein.

Such is the situation with reference to the question whether or not structural shapes, bolts and plates or a series of towers were purchased, and whether or not the actual cost to the original producer of design drawings, shop detail drawings and erection drawings, or the costs for the reproduction of them, is part of constructed value, and whether or not the cost of four tests on four new design towers in Italy, alleged to be

$4,980, or $5,130, as shown supra, is part of constructed value.

Plaintiffs make the contention in their original brief, page 14, that—

THE FAILURE OF THE APPRAISER TO REPORT, SEPARATELY, THE COST OF MATERIALS AND FABRICATION, THE GENERAL EXPENSES AND PROFIT, THE COST OF CONTAINERS AND PACKING IN THE APPRAISEMENTS UNDER REVIEW DEPRIVES THOSE APPRAISEMENTS OF THE USUAL PRESUMPTION OF CORRECTNESS.

Plaintiffs' reply brief, page 2, asserts:

* * * The Appraiser made separate appraisements on three different categories of the tower steel, at three different unit values. The structural shapes were appraised at $.10282 per pound, the steel bolts at $.2222 per pound and the steel plates at $.1555 per pound.

In so doing, the Appraiser carried out his statutory duty as defined in Section 500 of the Tariff Act of 1930 * * *.

If, as stated in plaintiffs' reply brief, each appraiser "carried out his statutory duty" in the above indicated appraisement of the three separate items herein involved, it would seem admitted that the appraisements were legally proper. Therefore, it was *not* necessary for the appraiser to report separately, the cost of materials and fabrication, the general expenses and profit, and the cost of containers and packing. Thus the appraisement under review *would carry the usual presumption of correctness.*

No case has been called to the court's attention, and none has been located upon research, to the effect that an appraisement under the 1930 tariff act, as amended, supra, loses its statutory presumption of correctness upon failure by the appraiser to state the separate elements of constructed value, or its predecessor, cost of production under the original 1930 tariff act. It is true that importer's appeals have been dismissed for failure to prove the amount of each of the four elements of cost of production, as indicated in the two cases cited by plaintiffs of Snow v. United States, 24 CCPA 319, T.D. 48767, and United States v. Malhame & Co. and Malhame & Co. v. United States, 24 CCPA 448, 454, T.D. 48911. Plaintiffs' original brief, page 17, asserts that

There is certainly no reason why the appraiser should be subject to any different rule than the Court has applied to the importer.

This argument is irrelevant so far as the customs tribunals are concerned and might be addressed to Congress. The court observes that "It shall be the duty of the appraiser * * * (1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power * * *" (section 500, Tariff Act of 1930). Moreover, by statute, 28 U.S.C., section 2633 (June 25, 1948), Congress provided that "The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise." Congress used the same language as the foregoing when it previously enacted section 501 of the Tariff Act of 1930.

The courts having jurisdiction over civil customs matters have consistently adhered to the statutory principle that the value found by the appraiser is presumed to be correct. Failure to prove otherwise leaves the appraised value in full force and effect. The Government need not prove the correctness of the appraised value unless and until the plaintiff has shown the appraisement to be erroneous. Lilli Ann Corporation v. United States, 57 Cust.Ct. 714, Reap. Dec. 11248; Hoenig Plywood Corp., and Williams, Clarke Co. v. United States, 41 Cust.Ct. 607, A.R.D. 91; United States v. Daystrom, Inc., Intl. Sales Div. et al., 56 Cust.Ct. 769, A.R.D. 203, affirmed

Daystom, Inc. et al. v. United States, 54 CCPA, C.A.D. 920; C. J. Tower & Sons of Buffalo, Inc. v. United States, 58 Cust.Ct., A.R.D. 223; United States v. Collin & Gissel (Ludwig Baer), 29 CCPA 96, C.A.D. 176; Brooks Paper Company v. United States, 40 CCPA 38, C.A.D. 495; Kittleson v. United States, 40 CCPA 85, C.A.D. 502; United States v. E. R. Squibb & Sons et al., 42 CCPA 23, C.A.D. 564; Kobe Import Co. v. United States, 42 CCPA 194, C.A.D. 593; United States v. Baar & Beards, Inc., 46 CCPA 92, C.A.D. 705; Arditi v. United States, 50 CCPA 49, C.A.D. 818; United States v. Clayton Chemical & Packaging Company, 357 F.2d 1009, 52 CCPA 111, C.A.D. 867. It is a well-established rule of law and of long standing that the official acts of the customs officials are presumed to be correct. In United States v. Frank & Lambert, 2 Ct.Cust.Appls. 239, 242, T.D. 31973 (October 16, 1911), involving the act of June 10, 1890, the court stated—

> * * * official action by a customs officer is presumed to be regularly and lawfully had; and the force of this presumption is not to be passed over lightly, but to be regarded as always present and necessary to be considered when the acts of customs officials are assailed. * * *

The court cited from Arthur v. Unkart, 96 U.S. 118, 24 L.Ed. 768 (October 1877) and then stated:

> As the corollary of this doctrine, one who would set aside the acts of such officials must assume the burden of proving that in fact or law error has been committed.

Note also United States v. Glendinning, McLeish & Co., Inc., 12 Ct.Cust.Appls. 222, 223, T.D. 40229 (May 19, 1924), decided under the 1922 tariff act, citing United States v. Rappolt & Co., 9 Ct. Cust.Appls. 21, T.D. 37846 (November 26, 1918), decided under the 1913 tariff act.

On the entire record, the court is of opinion that the plaintiffs have *not* established by competent or satisfactory evidence a constructed statutory value different from the constructed value returned by the appraisers for each of said invoiced structural shapes, steel bolts (and nuts), and plates or castings. Plaintiffs have, therefore, failed to make a *prima facie* case for its claimed constructed value for each of said invoiced articles.

Based upon the record, the court makes the following findings of fact:

1. The merchandise covered by these 46 consolidated reappraisement appeals is invoiced as structural steel shapes, steel bolts (and nuts) and steel plates or castings which were exported from Milan, Italy, during 1960 and 1961.

2. The imported merchandise is not listed on the final list promulgated by the Secretary of the Treasury in 93 Treas.Dec. 14, T.D. 54521.

3. Appraisement was made on the basis of constructed value, admittedly the correct basis for appraisement, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165.

4. Plaintiffs claim lower values than the appraised value for each of said invoiced items on the basis of constructed value for said merchandise.

5. The evidence of plaintiffs' witnesses is based upon an alleged examination of the exporter's books with reference to the costs of material and fabrication, and general expenses and profit, and cost of packing, without a showing that they were familiar or personally knowledgeable thereof, or made the entries, or supervised their making, or were familiar with cost accounting or maintenance, or kept such books. Nor do the witnesses furnish any evidence that the general expenses and profit made by the exporter on the instant exportations are equal to the general expenses and profit reflected in sales to other United States importers.

On the record herein, I conclude as matters of law:

1. Constructed value, as defined in finding No. 3, supra, is the correct basis for appraisement of the involved merchandise.

2. Plaintiffs have not established a constructed value different from the appraisers' finding of constructed value for each of the invoiced articles.

3. The appraisers' finding of constructed value for each of the invoiced articles, in each of the 46 consolidated appeals, remains in full force and effect. Kobe Import Co. v. United States, 42 CCPA 194, C.A.D. 593.

Judgment will be entered accordingly.

WILSON, J., concurs.

## SCHEDULE OF REAPPRAISEMENTS

| Reap. No. | Coll. No. | Plaintiff | Entry |
|---|---|---|---|
| | | PORTLAND, OREG. | |
| R64/24209 | 9709 | Frank P. Dow Co., Inc. | 5992 |
| R64/24210 | 9710 | | 6781 |
| R64/24211 | 9711 | | 7312 |
| R64/24212 | 9712 | | 7354 |
| R64/24213 | 9713 | | 326 |
| R64/24214 | 9714 | | 868 |
| R64/24215 | 9715 | | 1396 |
| R64/24216 | 9716 | | 1397 |
| R64/24217 | 9717 | | 1419 |
| R64/24218 | 9718 | | 1794 |
| R64/24219 | 9719 | | 2073 |
| R64/24220 | 9720 | | 2074 |
| R64/24221 | 9721 | | 2339 |
| R64/24222 | 9722 | | 2340 |
| R64/24223 | 9723 | | 2341 |
| R64/24224 | 9724 | | 2345 |
| R64/24225 | 9725 | | 2551 |
| R64/24226 | 9726 | | 2970 |
| R64/24227 | 9727 | | 3023 |
| R64/24228 | 9728 | | 3026 |
| R64/24231 | 9731 | | 4084 |
| R64/24232 | 9732 | | 4085 |
| R64/24233 | 9733 | | 4664 |
| R64/24234 | 9734 | | 4668 |
| R64/24235 | 9735 | | 4669 |
| R64/24236 | 9736 | | 4670 |
| R64/24237 | 9737 | | 5145 |
| R64/24238 | 9738 | | 5791 |

SEATTLE, WASH.

| | | | |
|---|---|---|---|
| R65/911 | 11950 | Frank P. Dow Co., Inc. a/c Italian Economic Corporation | 713 |
| R65/912 | 11951 | | 12131 |
| R65/913 | 11952 | | 13844 |
| R65/914 | 11953 | | 13710 |
| R65/915 | 11954 | | 1600 |
| R65/916 | 11955 | | 2007 |
| R65/917 | 11956 | | 2607 |
| R65/918 | 11957 | | 2720 |
| R65/919 | 11958 | | 11435 |
| R65/921 | 11960 | | 3437 |
| R65/922 | 11961 | | 3842 |
| R65/923 | 11962 | | 4754 |
| R65/924 | 11963 | | 5877 |
| R65/925 | 11964 | | 7602 |
| R65/926 | 11965 | | 8986 |
| R65/927 | 11966 | | 12373 |
| R65/928 | 11967 | | 8868 |

Tacoma, Wash.
SEATTLE, WASH.

| | | | |
|---|---|---|---|
| R65/15265 | 12408 | Frank P. Dow Co., Inc. | 22–437 |

\*

